```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF OKLAHOMA
 2

 3   BIG CAT RESCUE CORP., a     )
     Florida not-for-profit      )
 4   corporation,                )
          Plaintiff,             )
 5                               )
                   -vs-          )  Case No. FJ-13-01-F
 6                               )
     BIG CAT RESCUE              )
 7   ENTERTAINMENT GROUP, INC.,  )
     et al.,                     )
 8                               )
          Defendants.            )
 9                               )

10

11

12

13               TRANSCRIPT OF HEARING

14        BEFORE THE HONORABLE SHON T. ERWIN

15        TUESDAY, AUGUST 4, 2015; 2:00 p.m.

16              OKLAHOMA CITY, OKLAHOMA

17
     For Plaintiff:
18       Heather L. Hintz
         Melvin R. McVay, Jr.
19       101 North Robinson Avenue
         13th Floor
20       Oklahoma City, Oklahoma 73102

21   For Defendant Schreibvogel:
         John B. Davis
22       101 Park Avenue
         Suite 250
23       Oklahoma City, Oklahoma 73102

24
         Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

C O N T E N T S

Opening by plaintiff................................  4

Opening by defendant............................... 10

PLAINTIFF WITNESSES:

HEATHER LEE HINTZ
DIRECT EXAMINATION BY MR. McVAY .....................17
CROSS-EXAMINATION BY MR. DAVIS ......................31
REDIRECT EXAMINATION BY MR. MCVAY ...................35
RECROSS-EXAMINATION BY MR. DAVIS  ...................36

MICHAEL LEE KRETH
DIRECT EXAMINATION BY MS. HINTZ .....................38
CROSS-EXAMINATION BY MR. DAVIS ......................47


DEFENDANT WITNESSES:

RYAN DUFFY
DIRECT EXAMINATION BY MR. DAVIS .....................49
CROSS-EXAMINATION BY MR. MCVAY ......................59
REDIRECT EXAMINATION BY MR. DAVIS ...................63


Closing by plaintiff................................64

Closing by defendant................................69

1          (Proceedings had on August 4, 2015.)

2          THE COURT:  Counsel, let's do this.  Let me just

3    meet with counsel in the back room.  Let's have a pre-hearing.

4          (Court has in-camera conference with counsel.)

5          THE COURT:  Please be seated.

6          This is Case Number FJ-13-01, District Judge Friot's

7    case.  Let's just call it Big Cat Rescue Corp versus, among

8    other parties, Joe Schreibvogel, also known as Joe Exotic.

9          We're here on plaintiff's motion seeking to hold

10   Mr. Schreibvogel in contempt of court for failure to obey a

11   court order.  That's ECF number 100.

12         Counsel, if you'll announce your appearances and also

13   introduce witnesses you expect to call, beginning with the

14   plaintiff.

15         MS. HINTZ:  I'm Heather Hintz for the plaintiff, Big

16   Cat Rescue Corp, here with Mel McVay, co-counsel, and Jason

17   Kreth, also counsel for plaintiff, who will be our witness.

18   Potentially I will need to testify as well.  I'm just not sure

19   how that will go.

20         THE COURT:  Okay.  For Mr. Schreibvogel.

21         MR. DAVIS:  John Davis for the defendant Joe Exotic.

22   The witness will be Ryan Duffy, who is not a counsel in this

23   case but counsel in a companion case.

24         THE COURT:  All right.  As to the whereabouts of Joe

25   Exotic, Mr. Davis, can you comment on that?

1    MR. DAVIS:  Yes, Your Honor.  He is in Iowa.  He was

2  out of town on business, could not attend.

3    The subject matter at hand can best be handled by my

4  witness, Mr. Duffy, as opposed to Joe Exotic, as far as --

5    THE COURT:  Certainly Mr. Exotic was aware of the

6  date and time and place of the hearing?

7    MR. DAVIS:  Yes, Your Honor.

8    THE COURT:  Okay.  Opening statement from the

9  plaintiff.

10    MS. HINTZ:  Your Honor, would you like us to use the

11  podium?

12    THE COURT:  Please.

13    MS. HINTZ:  I'm Heather Hintz with Mel McVay as we

14  indicated.  We're here on behalf of the plaintiff, Big Cat

15  Rescue Corp, seeking a determination that Defendant Joe

16  Schreibvogel Is in civil contempt for failing to comply with

17  the Court's order, docket number 99 in this case.

18    The order directed him to turn over a Great Dane trailer

19  to plaintiff by June 19th.  In that regard the Court also

20  ordered him to appear today to show cause why he should not be

21  held in contempt.  It's our understanding he's not here.  He's

22  in Iowa at a state fair.

23    The genesis of the motion for turnover was, our client

24  had a -- three judgments in Florida that totaled over a

25  million dollars.  They were domesticated in Oklahoma in this

1  Court as FJ-1, FJ-2, and FJ-3 in 2013.  So all the activity

2  has pretty much taken place here in the FJ-1 case, which was a

3  $953,000 judgment in favor of Big Cat Rescue and against

4  Mr. Schreibvogel and two other entities.

5      We moved on behalf of Big Cat Rescue for a hearing on

6  assets.  The Court granted that hearing, and it was held here

7  in this courtroom on March 6th.

8      In the course of that testimony Mr. Schreibvogel

9  identified, among other things, a Great Dane trailer that he

10  owned personally free and clear of any liens, but he said he

11  had loaned it to his friend Mr. Taranova, who lived in

12  Kaufman, Texas, and --

13          THE COURT:  Kaufman, Texas?

14          MS. HINTZ:  Kaufman, K-A-U-F-M-A-N.

15      Our understanding is that's, I think, southwest of Dallas

16  maybe 20 or 30 miles.  So essentially a Dallas suburb,

17  Dallas/Fort Worth suburb.

18      We consequently moved the Court for -- under Oklahoma

19  statute, Title 12 Section 850, for an order that the property

20  be turned over to Big Cat Rescue to be applied to the

21  judgment.

22      The Court entered an order.  And the order, docket 99,

23  ordered Mr. Schreibvogel to obtain possession of the trailer

24  within 5 days.  He had control over it.  He'd loaned it to his

25  friend.  To obtain possession in 5 days, which would have been

1    by -- I'm sorry.  To contact plaintiff's counsel within 5 days

2    to make arrangements to turn it over at a time and place

3    agreeable to the plaintiff.  So 5 days from the date of the

4    order would have been June 14th.

5        And the order further ordered him to obtain possession

6    and deliver within the jurisdictional limits of the court

7    within 10 days of the date of the order, which would have been

8    June 19th.

9        And the order further directed him not to damage or

10   dispose of or transfer the property in any way in the interim.

11       And subsequently we did not have any contact with the

12   plaintiff.  We wound up reaching out to the plaintiff.  We

13   didn't hear anything within the time limits of the order.

14   June 19th passed.  We didn't hear anything from the

15   plaintiff -- I'm sorry.  I beg your pardon.  The defendant.

16       We contacted defendant's counsel by e-mail to inquire why

17   we hadn't heard anything.  The deadline to communicate with us

18   and to turn over the trailer had passed.  We reached out to

19   defendant's counsel several times and didn't have any

20   substantive movement on producing the trailer.

21       Your Honor, under law -- case law provides that to

22   establish civil contempt three things needs to be shown:  That

23   a valid court order exists; that the defendant had knowledge

24   of the order; and that the defendant disobeyed and failed to

25   comply with the order.  All three of those things can be shown

1  here.

2      First, the order, docket 99, the turnover order, was a

3  valid order.  It was authorized by state law, Title 12,

4  Section 850, which allows a court to require property to be

5  turned over to satisfy a debt.  And, therefore, the first

6  prong was satisfied.  It was a valid order.

7      Secondly, the defendant had knowledge of the order.  The

8  order was entered in this case.  It was served via the ECF

9  system.  Defendant's counsel had a copy of the order.  So

10  there was knowledge of the order.

11      Third, the defendant did disobey and failed to comply

12  with the order.

13      The order, again, was issued on June 5th and was very

14  clear.  It set out, in separately numbered paragraphs, that

15  the defendant or his counsel was to contact plaintiff's

16  counsel within 5 days of the date of the order, which would

17  have been June 14th, to make arrangements.

18      No such contact was received.  We did not receive an

19  e-mail, a phone call, or any other contact from defendant or

20  his counsel by June 14th.  In fact, we didn't receive any

21  contact at all even by June 19th, which was the date by which

22  we were to have been delivered the trailer.

23      So defendant's -- neither defendant nor his counsel ever

24  reached out to us.  The defendant failed to contact us.

25      And I would request leave to present Mr. Kreth, who can

1  testify as to the contact that he initiated with the

2  plaintiff's -- with the defendant's counsel, if this would be

3  an appropriate time to --

4          THE COURT:  I think I need to hear testimony.  Of

5  course your opening statement is not evidence.

6          MS. HINTZ:  Yes.

7          THE COURT:  So I'll need to hear -- well, it's up to

8  you.  You've got the burden if you want to produce a witness.

9          MS. HINTZ:  Well, the reason I'm asking is because

10 you requested an opening statement.  I didn't know if you

11 wanted to turn over to defendant now and have me do evidence

12 later or how you wanted me to proceed.

13         THE COURT:  Let's do opening statement from the

14 defense.  Anything from the defense?

15      I assumed you were finished.  Were you finished?

16         MS. HINTZ:  I would like to conclude my opening

17 statement by saying that the order was valid, the defendant

18 had reasonable knowledge, he completely failed to disobey --

19 completely failed to obey the order and failed to comply with

20 it.

21      In fact, as further evidence of the kind of lack of

22 regard, he was ordered to be here today physically and isn't

23 here and is voluntarily at Iowa at a state fair.

24      Coincidentally, he's there with Mr. Taranova, who he

25 testified has possession of the trailer in Texas.  They're

1   friends and they're at the Iowa fair together in Davenport,

2   Iowa.

3   　　We are -- we -- because the order was not complied with,

4   we reached out again to defendant's counsel advising that we

5   were going to have to move for contempt if we didn't get some

6   movement, some information, which our witness will testify.

7   We didn't get any response, none at all.

8   　　So we did move for contempt, and there was no response to

9   the contempt order.  There was no motion to quash it.  There

10   was no phone call to us.  There was no contact with us.

11   　　Subsequently the Court ordered -- issued the order that

12   brings us here today, which was for Mr. Schreibvogel to come

13   and show why he should not be held in contempt.  Again, he

14   failed to appear today.

15   　　So we will seek -- we believe we will present sufficient

16   evidence of civil contempt under the prevailing law.  We

17   request an award of our fees and costs and an order that the

18   Court -- an order by the Court rather to deliver -- that the

19   defendant deliver the trailer to us within 10 days of today's

20   date in a condition that is appropriate and has not been

21   molested or damaged in any way since the date of the original

22   Court's order and at a place convenient and acceptable to us.

23   　　If the defendant should fail to comply by delivering the

24   trailer to us here within 10 days of the date of the Court's

25   order, which would be Judge Friot's order, that further

```
 1    contempt would be levied.

 2              THE COURT:  What do you believe to be the value of

 3    the trailer?

 4              MS. HINTZ:  Well, Your Honor, we haven't been able

 5    to access it to have it appraised, but judging by the pictures

 6    we have -- a picture was presented at the hearing on assets --

 7    and looking at values through reliable sources, we believe

 8    anywhere between $6,000 and $16,000.

 9              THE COURT:  6 to 16,000?

10              MS. HINTZ:  Yes.

11        It could be a little higher, but that seems to be the

12    average range, the average -- taking into account the mileage

13    and condition and so forth, which we don't know.

14        It's -- it's not a mileage in the sense of an odometer

15    because it's a trailer that's pulled by a semi cab.  It's not

16    a motorized vehicle.  It's a semi trailer of the type that

17    would be pulled by, you know, 18-wheeler-type cab.

18              THE COURT:  Anything further?

19              MS. HINTZ:  No.  Thank you.

20              THE COURT:  All right.  Opening from the defense or

21    defendant.

22              MR. DAVIS:  Thank you, Your Honor.

23        Defendant Joe Schreibvogel, however you want to say it --

24    I'm going to butcher it, but you've got the spelling.  There's

25    no contest that there's a valid order, okay.  There's no
```

 1    contest that that order was properly delivered and properly
 2    served.
 3         At the hearing on assets it was fully disclosed that
 4    there was a trailer.  The location in Kaufman, Texas, was
 5    fully disclosed.  While I don't have the transcript with me, I
 6    know at the hearing on assets it was at least voiced "if you
 7    guys want the trailer, you can have it."  There's never been a
 8    challenge to them going and getting the trailer.
 9         The trailer is probably not worth 16,000.  It's probably
10    not worth 6,000.  It may be worth 4,000.  That's probably
11    being pretty liberal, maybe 5-.
12         The trailer is not tagged.  It is not -- you can't
13    transport it.
14         The defendant in this situation is -- these are my words.
15    Based upon the hearing on assets, he is as close to destitute
16    as one could be.  He makes very little money.  He will never
17    challenge the plaintiffs going and getting the trailer nor
18    does he challenge it now.
19         He would simply say he doesn't have the money to tag it
20    and then transport it up here.  But if they want to go get in
21    Kaufman, Texas, they can.
22         If they need the title -- certificate of title to the
23    trailer signed over to them, he can do that if he can find it.
24    If not, he can sign a certificate for lost title.
25         The defendant, he is in Iowa.  He is working.  He is

1   conducting business.  There's no doubt about that.  He's not

2   here to be in defiance of the Court.  He's not trying to be in

3   defiance of anything.  He is willing to turn the trailer over.

4        There has been communication about this.  I would call

5   Ryan Duffy, when we get to the evidentiary side.  Mr. Duffy is

6   an attorney with Andrews Davis.  There is a companion case to

7   this case.  This case that we're on today is the domestication

8   of about a million-dollar judgment out of the state of

9   Florida.

10        We're not challenging the domestication of the judgment.

11   We're not -- we had participated in the HOA.  We are not party

12   to the other lawsuit.  But Mr. Duffy, in order to try to

13   settle the other lawsuit, also on behalf of my client and on

14   behalf of me, to keep fees down to my client, did make sort of

15   a global settlement offer.

16        And ironically one of the pieces of evidence I'm going to

17   present is an e-mail from Mr. Duffy to plaintiff's counsel on

18   the exact same day as the motion for contempt was filed simply

19   saying that, "Hey, I've communicated with John Davis.  You

20   guys can go get the trailer," you know.  And that's where we

21   are.

22        So the first two elements, we don't challenge.  We don't

23   need to have an evidentiary hearing on that.  It's a valid

24   order.  It was validly communicated, delivered, served,

25   however you want to say it.

1      We'd completely challenge the fact that he's been

2   defiant, disrespectful of the court.  They can have the

3   trailer.  They can go to Kaufman, Texas, and get it.  He will

4   tell them exactly the location of it.  I believe he told them

5   that at the HOA.  They know who's in possession of the

6   trailer.

7      He has not physically been in possession of the trailer

8   since he delivered it -- or his friend borrowed it and left it

9   in Kaufman.  He's not responsible for the condition of it.

10     He believes it's in the same condition as the pictures

11  that were presented at the hearing on assets.  Doesn't have

12  the money to title it to get it up here.

13     So that would be our opening statement, Your Honor.  It

14  is a valid order; we do agree with that.  There was

15  communication through Mr. Duffy.  I readily admit it wasn't

16  through me; it was through Mr. Duffy.  I do agree with that.

17     Do you have a question?

18          THE COURT:  No, no.  I'll save it for later.  I did

19  give you that look though, you're right.

20          MR. DAVIS:  Thank you, Your Honor.

21          THE COURT:  All right.  Plaintiff may call its first

22  witness.

23          MR. McVAY:  Your Honor, if I could, this was just an

24  opening statement.  Is counsel then willing to stipulate for

25  the record that the -- as to the validity of the order, that

1   the order is valid and that the order was properly served?

2   Can we have that as a stipulation?

3          THE COURT:  I believe that's what I heard.

4          MR. DAVIS:  I stipulated.

5          MR. McVAY:  I heard you say that.  I just -- it was

6   opening statement.  I just wanted to make sure it was

7   stipulated to.

8          THE COURT:  You're right, opening statement is not

9   evidence.

10      But, Counsel, you-all can stipulate as to Element 1,

11   which is the order, ECF number 99 entered on June the 9th, is

12   clear and unambiguous?

13          MR. DAVIS:  Correct.

14          THE COURT:  So we've got a stipulation --

15          MR. McVAY:  Yes, Your Honor.

16          THE COURT:  -- as to the first element.

17      The second element, the proof of Joe Exotic's

18   noncompliance with the first order is clear and convincing.

19   Do we have a stipulation on that?

20          MR. DAVIS:  No, Your Honor.  The second element is

21   the service of the order, proper service, if I'm not mistaken.

22          THE COURT:  You'll stipulate as to -- you-all may be

23   looking at the Oklahoma statute.  And I don't care about the

24   Oklahoma statute on contempt.  I'm going with the federal

25   statute.

1    So proper service is stipulated.  So he had notice of the

2  order?

3              MR. DAVIS:  Yes, Your Honor.

4              THE COURT:  Okay.  We've got that -- so that's the

5  extent of the stipulation then.

6      We're not going any further than that?

7              MR. DAVIS:  No, Your Honor.

8              THE COURT:  Okay.

9              MR. McVAY:  And then the remaining element that we

10 have was failure to comply.

11             THE COURT:  I think you've got -- clear and

12 convincing is your burden on failure to comply.

13     You also have an additional element as -- well, I want to

14 know whether Mr. -- whether Joe Exotic has been diligent in

15 attempting to comply with the order.  That's something I think

16 that is going to, of course, come up on the defendant's side.

17     So with that, you may call your first witness.

18     Any other clarification needed?

19             MR. McVAY:  No, Your Honor.  Thank you.

20             MS. HINTZ:  Your Honor, the plaintiff would call

21 Jason Kreth.

22             THE COURT:  All right.  Mr. Kreth, if you'll come

23 forward and be sworn.

24                     (Witness duly sworn)

25             THE COURT:  Let me make something clear that I

1    perhaps didn't earlier.

2           As to the third element, what I see as the third element

3    in this proceeding, it must be shown by plaintiff -- by the

4    movant that Mr. Schreibvogel has not been reasonably diligent

5    and energetic in attempting to accomplish what was ordered.

6           So to repeat, it must be shown that Joe Exotic has not

7    been reasonably diligent and energetic in attempting to

8    accomplish what was ordered.  You may proceed.

9                MS. HINTZ:  Your Honor, I think it might make more

10   sense for Mr. McVay to question me first since I was the first

11   individual, chronologically, that had actual movement with

12   respect to this order.

13               THE COURT:  Certainly.

14               MS. HINTZ:  So if we could switch.

15          But I'd also like to ask, since we've already discussed

16   some stipulations, can we stipulate as to orders and motions

17   and such that are a part of the court record, or do we need

18   to -- are you considering those to be evidentiary matters that

19   need to be entered into the -- if the witness is going to

20   review an order, does it need to be entered in as an exhibit,

21   or can we simply refer to the docket number?

22               THE COURT:  I think you can refer to it by docket

23   number.

24          Any objection?

25               MR. DAVIS:  No objection, Your Honor.

1        MS. HINTZ:  Thank you.

2                (Witness duly sworn)

3        THE COURT:  All right.  So we've got Mr. McVay

4    performing a direct examination of Heather Hintz.

5                      **HEATHER LEE HINTZ,**

6    after having been first duly sworn, testifies as follows:

7                      **DIRECT EXAMINATION**

8    BY MR. McVAY:

9    Q.   Please state your full name.

10   A.   Heather Lee Hintz.

11   Q.   Ms. Hintz, where are you employed?

12   A.   I am employed as a lawyer at Phillips Murrah, PC law firm

13   in Oklahoma City.

14   Q.   How long have you been employed there?

15   A.   I've been employed there for 25 years this month.

16   Q.   And have you served as counsel for the plaintiff, Big Cat

17   Rescue, in this proceeding?

18   A.   Yes.

19   Q.   How long have you served as counsel for Big Cat Rescue in

20   this proceeding?

21   A.   I've represented Big Cat Rescue since 2012.  But in this

22   FJ-1 case, since the spring -- probably February, March of

23   2013.

24   Q.   Have you represented Big Cat Rescue with respect to

25   judgments that had it obtained in the Middle District of

1   Florida against the Defendant Joe Schreibvogel?

2   A.    In the state of Oklahoma, yes, I've represented Big Cat

3   Rescue.  I did not represent them in the Florida litigation.

4   Q.    What is the total amount of that judgment -- or those

5   judgments?

6   A.    The three judgments are over $1 million dollars.

7   They're, I believe, 1.03 million.

8   Q.    And have those judgments been domesticated in the United

9   States district court for the Western District of Oklahoma?

10  A.    Yes.  They were domesticated in three different cases in

11  the United States District Court for the Western District.

12  There's 2013-FJ-1, which is the case we're in here today.

13  That was a $953,000 judgment.

14        Then there was 2013-FJ-2, and then 2013-FJ-3.  They were

15  all assigned to Judge Friot.

16  Q.    Once those judgments were filed on behalf of the

17  plaintiff, Big Cat Rescue, did you file a motion for a hearing

18  on assets and obtain an order from this court in that regard?

19  A.    Yes.

20        I filed a motion for hearing on assets and obtained an

21  order for a hearing on assets.

22  Q.    Was a hearing on assets then conducted on March the 6th,

23  2015, of Joe Schreibvogel -- Defendant Joe Schreibvogel?

24  A.    It was.  But the first motion for hearing on assets was

25  filed in 2013.  And the day the order issued,

1    Mr. Schreibvogel -- on the day it was issued or around the day
2    it was issued -- I can't remember exactly if it was the day of
3    or the next day -- he filed a Chapter 7 bankruptcy proceeding.
4        So the original hearing on assets in this case that was
5    set for the spring of 2013 was withdrawn since he -- the
6    defendant filed a Chapter 7 bankruptcy proceeding.
7        So we then proceeded to conduct a Rule 2004 examination
8    in the bankruptcy proceeding and ultimately the -- all of
9    Mr. Schreibvogel's debts, including the debts to Big Cat
10   Rescue, were determined to be non-dischargeable, and the stay
11   was lifted.
12       And then the proceedings began again in this case, and we
13   did file a motion for hearing on assets.  The hearing on
14   assets was ultimately conducted on March 6th of 2015.
15   Q.   And that hearing on assets was, in fact, conducted by
16   myself and you; is that correct?
17   A.   That's right.
18   Q.   And during that -- in conducting that hearing on assets,
19   did you learn that there was a Dane trailer that was owned by
20   Mr. Schreibvogel personally that had no liens against it?
21   A.   Yes, a Great Dane trailer.
22   Q.   During the course of that hearing on assets, did you
23   learn where that trailer was located?
24   A.   It was testified that it was located in Kaufman, Texas.
25   Q.   What was your understanding as to why it was located in

1   Kaufman, Texas?

2   A.   My understanding was that Mr. Schreibvogel, the

3   defendant, was good friends with a tiger handler named Doug

4   Taranova, who ran a company called Taranova Enterprises, and

5   they frequently did favors for one another.

6        And Mr. Taranova had both a semi cab that would pull the

7   Great Dane trailer and the Great Dane trailer located on his

8   property in Kaufman, Texas, just on a borrowing situation.   He

9   needed it to move an animal, I believe was the testimony.

10  Q.   So the unencumbered trailer owned by Mr. Schreibvogel was

11  located in Kaufman, Texas, on Mr. Taranova's property; is that

12  correct?

13  A.   That was my understanding from the testimony.

14  Q.   Okay.  Subsequent to the hearing on assets, did you, on

15  behalf of Big Cat Rescue, file a motion for turnover of

16  property that asked this Court to require that

17  Mr. Schreibvogel turn over the Great Dane trailer?

18  A.   Yes.

19  Q.   That, in fact, is document number 88 and it was filed on

20  April 14th, 2015; is that correct?

21  A.   Correct.

22  Q.   And subsequent to filing this motion -- let me ask it

23  this way:  After filing this motion, did Mr. Schreibvogel or

24  his counsel ever file a response to the motion for turnover?

25  A.   No.

1   Q.   Were they properly served?

2   A.   Yes.

3   Q.   Having not received any response, did this Court enter an

4   order granting plaintiff's motion for turnover of property,

5   document 99, which was filed on June 9th, 2015?

6   A.   Yes.

7            MR. McVAY:  May I approach, Your Honor?

8            THE COURT:  You may.

9   Q.   (BY MR. McVAY)  Do you just have one copy?

10  A.   Yes.

11  Q.   I thought I had an extra copy to give to counsel.

12           THE COURT:  It's document number 99.

13           MR. McVAY:  Yeah, it is document number 99.  I seem

14  to only have the two copies.

15           THE COURT:  You can have mine.

16  Q.   (BY MR. McVAY)  Let me refer you to document number 99,

17  which has been marked as Plaintiff's Exhibit No. 1.

18           MR. McVAY:  I apologize to the Court and Counsel.

19           MR. DAVIS:  Your Honor, we'll stipulate that

20  document 99 is a matter of court record and it's a valid

21  order.  We don't have any problem with that.

22           THE COURT:  All right.  So it really doesn't even

23  need to be admitted.  If you want to admit it, fine.  It's

24  admitted, document 99.

25           MR. McVAY:  All right.

1    Q.   (BY MR. McVAY)   Let me refer you to Plaintiff's Exhibit

2    No. 1 and page 2 of that document.

3         If you could look at paragraph 4.   Can you read paragraph

4    4, in terms of what the Court has ordered with respect to this

5    document?

6    A.     Numerical paragraph 4?

7    Q.     Yes.

8    A.     It says, "Accordingly, the motion is deemed confessed and

9    the relief requested therein by BCR should be and is hereby

10   granted."

11   Q.     Then proceeding on.

12   A.     "It is therefore ordered, adjudged, and decreed the

13   defendant is directed to obtain possession of the Great Dane

14   trailer, VIN No. 1GRAA0618TS080003, (the "trailer") identified

15   in the motion and deliver the trailer to BCR within 10 days of

16   the date of this order.

17        "It is further ordered --

18   Q.     Let me stop you right there for a minute, if I could.

19        This order is dated June the 9th, 2015; is that correct?

20   A.     Yes.

21   Q.     Pursuant to that paragraph that you just read, was the

22   Great Dane trailer delivered to the plaintiff within 10 days

23   of the date of this order or by June the 19th?

24   A.     It was not.

25   Q.     All right.   If you would read the next paragraph.

A.    "It is further ordered, adjudged, and decreed the
defendant or his counsel shall contact counsel for BCR within
5 days of the date of this order to arrange a time and
location suitable to BCR and within the jurisdictional limits
of this Court for delivery of the trailer to BCR in accordance
with this order."

Q.    Pursuant to the Court's order and the reading of this
paragraph, did you receive any communication from
Mr. Schreibvogel or his counsel within 5 days of the date of
this order to arrange a time and location suitable for BCR to
obtain delivery of the Great Dane trailer?

A.    I did not.

      And in conferring with others, there was no communication
received.

Q.    When you say "with others," in conferring with other
members of your firm?

A.    I believe I spoke with you, Mr. McVay, and I spoke with
Mr. Kreth.

Q.    Those would be all of the people that are involved in
this proceeding; is that correct?

A.    Yes.

Q.    Having not received possession of the Great Dane trailer
or any information from defendant or defendant's counsel as to
a time or location to pick up the trailer, did you, on behalf
of the plaintiff, Big Cat Rescue, file a motion for turnover

1    of property?

2    A.    I did.

3    Q.    And was that filed on --

4    A.    Actually, it was a motion for -- it was a motion for --

5    Q.    For contempt?

6    A.    For contempt, yes.

7    Q.    Right.

8          And do you recall when that was filed?

9    A.    The 14th of June, I believe.

10         THE COURT:  Let's get a stipulation here.  We're

11   talking about document number 100.

12         Will the parties stipulate that document number 100 is

13   plaintiff's motion to hold Joe Schreibvogel in contempt?

14         MR. DAVIS:  Yes.  It was filed on July the 10th.

15         WITNESS:  July the 10th.

16         THE COURT:  And filed on July the 10th.  So we don't

17   need to introduce that as --

18         MR. DAVIS:  So stipulated.

19         THE COURT:  Unless you just want to refer to it as

20   Exhibit No. 2, if that's what's coming.

21         MR. McVAY:  I don't think I'll need to do that if

22   we're stipulating at this point.

23   Q.  (BY MR. McVAY)  Was plaintiff's motion to hold Defendant

24   Joe Schreibvogel in contempt of court, document number 100,

25   served on counsel for the defendant?

1   A.   It was through the ECF system of the Court.

2           MR. DAVIS:  We'll stipulate there was service, Your

3   Honor.

4           THE COURT:  Okay.

5           MR. McVAY:  Thank you, Counsel.

6           THE COURT:  All right.  We've got a stipulation as

7   to service on counsel and I think also a stipulation as to

8   service on Mr. Schreibvogel.

9           MR. DAVIS:  Yes, Your Honor.

10          THE COURT:  Of the motion and the order?

11          MR. DAVIS:  Yes, Your Honor.

12          THE COURT:  Document number 100 and document

13  number --

14          MR. McVAY:  102.

15          THE COURT:  -- 102.

16  Q.  (BY MR. McVAY)  Ms. Hintz, was any response filed by

17  Mr. Schreibvogel or his counsel with respect to Big Cat Rescue

18  Corporation's motion to hold Mr. Schreibvogel in contempt?

19  A.   There was no response filed.

20  Q.   In fact, on July 17th, 2015, the Court issued its order

21  to show cause; is that correct?

22  A.   Yes.

23  Q.   And that's document number 102 --

24  A.   Yes.

25  Q.   -- for the record?

1    And did that order order Mr. Schreibvogel to appear today
2    at two o'clock in this courtroom?
3    A.   Yes.
4    Q.   And as already has been, I believe, stipulated by counsel
5    to the Court, Mr. Schreibvogel is not present today; is that
6    correct?
7    A.   Correct.
8    Q.   Until you received a call -- well, did you receive a call
9    this morning from Mr. Schreibvogel's counsel?
10   A.   I did not receive a call from Mr. Schreibvogel's counsel.
11   I received a call from Mr. Duffy, who represents the
12   Gerold Wayne Interactive Zoological Park in another action,
13   and Mr. Schreibvogel works for the Gerold Wayne Interactive
14   Zoological Park, but Mr. Duffy does not represent
15   Mr. Schreibvogel in this action.
16   Mr. Duffy called this morning, which was the first I had
17   heard from anyone affiliated with Mr. Schreibvogel since the
18   order to show cause had been issued.
19   From the order to show cause for Mr. Schreibvogel to
20   appear today, I did not receive any contact from anyone
21   affiliated with Mr. Schreibvogel with regard to the order or
22   the hearing set for today.
23   This morning, I did receive a call from Mr. Duffy asking
24   for a call back.  I called him back with you, Mr. McVay,
25   and --

1  Q.    That's all I'm asking at this point.

2  A.    Yes, uh-huh.

3  Q.    Up until this morning -- from the time that the Court

4  issued its order granting plaintiff's motion for turnover of

5  property to this morning, had you received any contact from

6  Mr. Schreibvogel or his counsel with respect to the turnover

7  of property or the order to show cause offering any

8  explanation or demonstrating in any way that Mr. Schreibvogel

9  has been diligent in attempting to turn over the trailer?

10 A.    No.

11       There was an e-mail from -- it was not from

12 Mr. Schreibvogel's counsel.  It was from the -- I believe the

13 zoo's counsel, and it disclaimed any interest of the zoo in

14 the trailer.

15       It said the trailer was Mr. Schreibvogel's and the

16 trailer remained in Texas.  And I believe Mr. Davis was copied

17 on that e-mail saying that he, you know, could then take over

18 and do whatever he needed to do to -- I don't know what was

19 intended by the sender of the e-mail, but we never received

20 any contact from Mr. Davis after that e-mail from Mr. Duffy or

21 his colleague.

22 Q.    So other than the e-mail that you've talked about and

23 other than the conversation this morning, those are the only

24 communications that you've had or any member of your firm

25 involved in this case has had with respect to the turnover of

1   the Great Dane trailer; is that correct?

2   A.   Well, we had some, what I would characterize as

3   primarily, unilateral communications when we did not receive

4   any communication between the date that the order was issued

5   and then the response dates required, I believe it was the

6   15th and the 19th of June.

7        The order was issued, I believe, the 9th of June.  The

8   order directed the defendant to contact us by the 9th of June.

9   We did not receive any contact by the 9th of June.

10       The order required Mr. Schreibvogel or his counsel to

11  deliver the trailer by the 15th of June.  We did not receive

12  any contact.

13       At some point after that I asked Mr. Kreth to reach out

14  to Mr. Davis and try to establish --

15  Q.   So is it fair to say that you and members of your firm

16  were diligent in following up with Mr. Schreibvogel as to why

17  the Court's order had not been obeyed?

18  A.   I believe so, yes.

19  Q.   But, in fact, Mr. Schreibvogel or his counsel was never

20  diligent in following up with you or any member of your firm

21  until here recently as to why the trailer had not been turned

22  over; is that correct?

23            MR. DAVIS:  I object.  Mischaracterization of the

24  testimony and a leading question.

25            WITNESS:  Well --

1    THE COURT:  Sustained.

2    WITNESS:  -- we -- I did not receive any

3 communication that -- I received absolutely no communication

4 during the response time that was required by the order.

5   So there was -- I don't think -- there was zero

6 communication from defendant or defendant's counsel by --

7 before June 15th.

8 Q. (BY MR. McVAY)  Let me ask you this:  Mr. Davis is counsel

9 for Joe Schreibvogel; correct?

10 A. Yes.

11 Q. When was the last time you any communication from Joe

12 Schreibvogel, other than this morning, or his counsel?

13 Mr. Schreibvogel or his counsel other than this morning?

14 A. I personally -- it would have been before the order was

15 entered, aside from the fact that he was cc'd on the e-mail

16 from -- he was cc'd on the e-mail from plaintiff's -- from

17 defendant's -- I beg your pardon.  Gerold Wayne Zoo's counsel,

18 but it was not a communication from Mr. Davis.

19   I have received no communications from Mr. Davis since

20 the Court's order for turnover was entered.

21 Q. Do you know where the Dane trailer is today?

22 A. My understanding is that it's still located in Kaufman,

23 Texas, but Mr. Schreibvogel is at a fair with Mr. Taranova in

24 Iowa.  In the past they've used that trailer to transport

25 animals.  So I don't know if they --

1          MR. DAVIS:  Your Honor, we will stipulate that the

2    trailer is in Kaufman, Texas.  It is not in Iowa.  It is not

3    tagged.  It is not legally available to go on the interstate

4    highway system.

5          THE COURT:  Okay.  So stipulated.

6    Q.  (BY MR. McVAY)  Just to make it clear -- I think it's

7    pretty clear from your testimony -- that Big Cat Rescue is

8    not, in fact, in possession of the trailer at this time?

9    A.    Correct.

10          MR. McVAY:  Can I have just one minute, Your Honor?

11          THE COURT:  Certainly.

12          MR. McVAY:  May I approach, Your Honor?

13          THE COURT:  You may.

14    Q.  (BY MR. McVAY)  Ms. Hintz, really for the benefit of the

15    Court, I think, more than counsel, I've handed you what has

16    been marked as Plaintiff's Exhibit 2.  That's from the

17    deposition of Mr. Schreibvogel.

18          Is that the trailer that we're talking about at the top

19    of that exhibit, the Dane trailer?

20    A.    My understanding is that is how Mr. Schreibvogel

21    identified it in his deposition.  I have not seen the VIN

22    number on the trailer.

23    Q.    Okay.

24    A.    That is the trailer he identified at the hearing on

25    assets.

1    Q.    All right.

2              MR. McVAY:  Move to admit Exhibit No. 2, Your Honor.

3              THE COURT:  Mr. Davis?

4              MR. DAVIS:  No objection.

5              THE COURT:  All right.  Plaintiff's 2 will be

6    admitted.  It's consisting of two pages.

7              MR. McVAY:  I believe that's all I have, Your Honor,

8    if we could reserve the right to recall Ms. Hintz for

9    rebuttal.

10             THE COURT:  Certainly.

11             MR. McVAY:  Thank you.

12             THE COURT:  Mr. Davis, cross-examination.

13             MR. DAVIS:  I'll be short, Your Honor.

14             THE COURT:  That's what they always say.

15             MR. DAVIS:  No.  I will be.

16                       **CROSS-EXAMINATION**

17   BY MR. DAVIS:

18   Q.    Counsel, has Mel McVay entered an appearance in this case

19   or in the other case?

20   A.    I would have to refer to the docket sheet.

21   Q.    May I approach, Your Honor?

22             THE COURT:  I've got the docket sheet if you want

23   it.

24   Q.    (BY MR. DAVIS)  The reason I'm asking is because of the

25   signature block; it's got you and Mr. Kreth.  I'm just --

1        THE COURT:  Here.  Let's go off the record just for

2   a second.

3            (Discussion held off the record).

4   Q.  (BY MR. DAVIS)  Off the record we established that

5   Mr. McVay is counsel -- one of counsel of record in this

6   matter.

7        Are you legal counsel in the other case that Mr. Duffy is

8   in?

9   A.   I don't know which case you're referring to, but if

10  you're referring to the case pending before Judge Cauthron --

11  Q.   Yes.

12  A.   -- yes, I am.

13  Q.   Okay.  And has Mr. McVay entered an appearance in that

14  case?

15  A.   Yes.

16  Q.   And has Mr. Kreth entered an appearance in that case?

17  A.   I don't recall.

18  Q.   What about Mr. -- one second, Your Honor.  What about

19  Mr. Justin Givens?

20  A.   He has.

21  Q.   Okay.  But maybe not Mr. Kreth?  We don't know?

22  A.   We'd have to check the docket sheet.

23  Q.   Okay.  The reason I'm asking is because -- have you been

24  part of the -- what I'm going to call settlement negotiations

25  between Mr. Duffy in the Judge Cauthron case and your client,

1    which is the same plaintiff in that case as in this case?

2              MR. McVAY:   Objection.   Relevancy.

3              MR. DAVIS:   Well, Your Honor, we're trying to

4    establish that the defendant here, Joe Schreibvogel, has been

5    cooperating as far back as the hearing on assets about this

6    trailer, and that Mr. Duffy has been in communication on a

7    global settlement.

8              THE COURT:   Objection overruled.

9              MR. DAVIS:   Okay.

10   Q.   (BY MR. DAVIS)   Were you a part of those, or was that

11   something that Mr. McVay did or Mr. Kreth did or Mr. Givens

12   did, those settlement negotiations and discussions and

13   e-mails?

14   A.   I have been a part of the settlement discussions.

15   Q.   Okay.   Is it a fair statement that those settlement

16   discussions started around mid-June?

17   A.   I would have to refer to the correspondence and my notes.

18   Q.   Okay.   As part of those settlement discussions, was there

19   an element that, not only this trailer that's the subject

20   matter of this contempt hearing, but that also any and all

21   other liability regarding the defendant in this case would be

22   resolved as part of a global settlement?

23   A.   The trailer was not referenced in the settlement offer.

24   Q.   Okay.   Was a global settlement offer, including a release

25   of Mr. Schreibvogel, part of those settlement discussions,

1   e-mails, negotiations?

2   A.   I would have to refer to the settlement offer, which was

3   confidential.  So I would not think it should be made a part

4   of a public record in the case.  I don't know if we're going

5   to seal this transcript.

6        It's a little awkward to be a witness and a lawyer.

7   Q.   I understand.

8   A.   The settlement offer that was made was a confidential

9   settlement offer.

10  Q.   Okay.

11  A.   The offer had a very short-term put to it, which has

12  since passed.

13  Q.   Okay.  So it's fair to tell the Court that there was no

14  settlement, but there was ongoing settlement negotiations; is

15  that --

16  A.   There was a settlement offer that was -- my understanding

17  is, there was one settlement offer made by the defendant,

18  Gerold Wayne Zoo, in the Judge Cauthron -- in the litigation

19  pending before Judge Cauthron that was intended to be a global

20  settlement.

21       There was not a response to the settlement.  There has

22  been no settlement consummated.

23  Q.   I just want to make sure we're clear.  As part of a

24  global settlement it would have included the release of Joe

25  Schreibvogel in this particular judgment, this trailer; it

1   would have resolved all of those issues?

2   A.   I would have to refer to the document.

3   Q.   Okay.

4        MR. DAVIS:  No further questions, Your Honor.

5        THE COURT:  All right.  Redirect, Mr. McVay?

6        MR. McVAY:  Just maybe one question.

7                    **REDIRECT EXAMINATION**

8   BY MR. McVAY:

9   Q.   Do you recall, Ms. Hintz, when that settlement offer that

10  Mr. Davis is referring to terminated, approximately?

11  A.   I believe it terminated -- well, I don't have that letter

12  in front of me, but I think it had a 4-day -- 4- or 5-day

13  trigger on it.

14       If it was, in fact, mid-June, as indicated, it would have

15  been -- you know, it would have terminated before we filed our

16  motion for contempt.

17  Q.   You're anticipating my questions, but that's okay,

18  because that was my next question, is whether that settlement

19  offer terminated prior to the filing of the motion for

20  contempt and the order setting this hearing for today?

21  A.   Yes.  We didn't respond to -- there haven't been ongoing

22  negotiations.

23  Q.   Is there any settlement offer currently pending?

24  A.   No.

25       MR. McVAY:  That's all I have, Your Honor.

1          THE COURT:  All right.  Recross?

2          MR. DAVIS:  I want to be very careful how I ask this

3    question.

4                    **RECROSS-EXAMINATION**

5    BY MR. DAVIS:

6    Q.   Did I hear your testimony to say that there is not

7    current ongoing settlement negotiations?  Is that correct?

8    A.   Well, my understanding is that -- I mean, I think those

9    are terms of art.

10         There was a formal settlement offer that was made by

11   the -- one of the defendants in the Gerold Wayne Zoo related

12   litigation that's pending before Judge Cauthron.

13   Q.   Okay.

14   A.   That's an alter ego case that Mr. Schreibvogel is not a

15   party to.

16   Q.   I understand he's not a party to it.

17   A.   And a written settlement offer was made by the Gerold

18   Wayne Zoo that contemplated folding in some other parties to

19   the various cases in a global settlement.

20         The letter -- I don't have it in front of me, but my

21   recollection is that it had a very short shelf life of 4 or 5

22   days.

23         That shelf life passed and the offer was not responded

24   to.  We have not received a subsequent formal settlement offer

25   from the parties in that litigation.  We have not made a

1   formal settlement offer in that litigation.

2   Q.   Justin Givens is in the Judge Cauthron case?  He's

3   entered an appearance; correct?

4   A.   Yes.

5   Q.   Okay.  If I made the statement that last Thursday, when

6   Mr. Duffy was at the airport on the way to Chicago to a

7   wedding, if I made the statement that Justin and he talked on

8   the phone and Justin said to expect a settlement offer early

9   this week, would you disagree that your co-worker, your

10  co-employee, made that statement to Mr. Duffy?

11  A.   I don't have any way to agree or disagree with that

12  statement.

13  Q.   Do you know anybody in your firm that would know the

14  status of the current ongoing global settlement in the Judge

15  Cauthron case that would include the resolution of this

16  matter?

17  A.   I don't understand your question.

18  Q.   Okay.

19  A.   I've already testified that I'm involved in the

20  settlement negotiations.  I don't know what Mr. Givens said

21  to -- or didn't say to Mr. Duffy or whomever.

22  Q.   But you don't dispute they had a conversation last

23  Thursday?

24  A.   I don't dispute or agree.  I don't know.

25  Q.   Okay.  Do you know anyone at your firm that would be able

1    to corroborate what Mr. Duffy's anticipated to testify to, one

2    way are the other, corroborate or deny it?

3          Would Mr. McVay know?

4    A.   I don't know anything about the conversation.

5                MR. DAVIS:  Okay.  Thank you, Your Honor.

6                THE COURT:  You may step down.

7                      (Witness excused).

8                THE COURT:  The plaintiff may call its next witness.

9                MS. HINTZ:  We now do call finally Mr. Kreth.

10               THE COURT:  If you'll come forward and be sworn.

11                     (Witness duly sworn)

12                     **MICHAEL LEE KRETH,**

13   after having been first duly sworn, testifies as follows:

14                     **DIRECT EXAMINATION**

15   BY MS. HINTZ:

16   Q.   Mr. Kreth, would you please state your name?

17   A.   It's Jason Michael Kreth.

18   Q.   And where are you employed?

19   A.   I am an attorney with the law firm of Phillips Murrah

20   here in Oklahoma City.

21   Q.   Have you entered an appearance in the case that we're

22   here on today?

23   A.   I believe so.

24   Q.   Mr. Kreth, are you familiar with the Court's turnover

25   order entered in this case, which has been stipulated to be

1   document 99?

2   A.   I am.

3        MS. HINTZ:   Your Honor, may I approach the witness?

4        THE COURT:   You may.

5   Q.   (BY MS. HINTZ)   This has already been entered into the

6   record as Exhibit 1.   I would ask you to take a look at it and

7   see if you're familiar with the order.

8   A.   I am familiar with this order.

9   Q.   How did you become familiar with the order?

10  A.   I believe I had a hand in drafting it.

11  Q.   And do you recall being asked to follow up on the order

12  after the -- at some point after the order was entered?

13  A.   I do.

14  Q.   Did you, in fact, engage in any follow-up with defendant

15  or defendant's counsel with respect to the order after it had

16  been entered?

17  A.   I did.

18       You had come to me after the time period for turnover of

19  the trailer had passed and asked me to follow up with John

20  Davis directly.

21       I believe my first attempted contact was on June 24th, if

22  memory serves.   I tried to call Mr. Davis, was unable to reach

23  him, and sent him an e-mail that same day indicating that I

24  was trying to reach him to discuss turnover of the Great Dane

25  trailer before we proceeded with moving for contempt.

1  Q.    Did you receive a response to that e-mail?

2  A.    I did.  I don't recall if it was the same day or if it

3  was a day or two later, but Mr. Davis responded to me,

4  indicated that he had been out of the office for medical

5  issues and that he would get back with me the following

6  Monday.

7            MS. HINTZ:  May I approach again?

8            THE COURT:  You may.

9            MS. HINTZ:  Let me mark this.

10  Q.  (BY MS. HINTZ)  Mr. Kreth, I've handed you what's been

11  marked as —— or will soon be marked as Exhibit 2.  I beg your

12  pardon.  Exhibit 3.  I seem to have misplaced my exhibit

13  stickers.

14      Mr. Kreth, have you had a chance to review what I've

15  handed to you marked Exhibit 3?

16  A.    I have.

17  Q.    And would you describe it?

18  A.    It is an e-mail chain between principally myself and John

19  Davis.  It's the series of e-mails I mentioned a second ago,

20  beginning with my first e-mail on June 24th at 10:45 following

21  up on my phone call to Mr. Davis, his response to me about

22  being out on medical issue, and then my response to him

23  indicating that I would follow up with him on Monday.

24  Q.    Could you please, with the date, read them into the

25  record in chronological order, starting on page 2 of Exhibit

1   3?

2   A.   Would you like me to read the content of the e-mails?

3   Q.   Just the content of the e-mail, yes, and the date.

4   A.   Okay.  Wednesday, June 24th, 2015, at 10:45, from myself

5   to John Davis.

6       "John, I called you on this but thought I'd send an

7   e-mail as well" --

8            MR. DAVIS:  Your Honor, we'll stipulate what the

9   e-mail says.

10           THE COURT:  All right.  And stipulate as to

11  admission of the e-mail into evidence?

12           MR. DAVIS:  Yes.

13           THE COURT:  All right.  So Plaintiff's Exhibit 3

14  will be admitted.  Thank you.

15  Q.   (BY MS. HINTZ)  Mr. Kreth, is it fair to indicate that you

16  contacted Mr. Davis on June 24th as a follow-up to a phone

17  call asking for -- well, why don't you just go ahead and read

18  that into the record as you were?

19  A.   Okay.  The first e-mail?

20  Q.   Yes.

21  A.   "John, I called you on this but thought I'd send an

22  e-mail as well.  I'm one of the attorneys representing Big Cat

23  in the above-referenced matter.

24      "On June 9th an order was entered directing Schreibvogel

25  to retrieve a Great Dane trailer and deliver it to us on or

1    before June 19th.  That hasn't been done.

2        "Before we end up moving for contempt, I wanted to touch

3    base to try to figure out what was going on and if anything

4    might be resolved ahead of us taking that next step.  Please

5    give me a call or an e-mail and let me know."

6    Q.   And was there a response from Mr. Davis?

7    A.   There was.

8    Q.   And did that, again, indicate that you would be following

9    up on -- with each other on Monday?

10   A.   That's correct.  He indicated he'd been out of the office

11   for a medical issue, and that he hadn't talked to his client

12   about the matter yet, but that he would get back with me on

13   Monday.

14            MS. HINTZ:  Your Honor, may I approach the witness?

15            THE COURT:  You may.

16   Q.   (BY MS. HINTZ)  Mr. Kreth, in the e-mail chain that's

17   before you as Exhibit 3, did you, in fact, agree that you'd

18   follow up with him on Monday?

19   A.   I did.

20   Q.   And do you recall what happened after that e-mail, in

21   terms of your communication with Mr. Davis?

22   A.   I never heard back from him.

23   Q.   Did you reach out to him again?

24   A.   I did.

25            MS. HINTZ:  Your Honor, may I approach the witness

1    again?

2             THE COURT:  Certainly.

3    Q.  (BY MS. HINTZ)  Mr. Kreth, I'm handing you what's been

4    marked as Defendant's -- rather, Plaintiff's Exhibit 4.

5             THE COURT:  Mr. Davis, any objection to admission of

6    Plaintiff's 4?

7             MR. DAVIS:  No, Your Honor.

8             THE COURT:  All right.  Plaintiff's 4 will be

9    admitted.

10   Q.  (BY MS. HINTZ)  Do you recognize that document?

11   A.    I do.

12   Q.    And what does it indicate?

13   A.    It's an e-mail from me to John Davis cc'ing Kip Reiswig,

14   who I believe is another attorney in John Davis's office, as

15   well as yourself.

16        It's a follow-up on Mr. Davis and I's previous

17   discussions.

18        I indicated that I would need to file a motion for

19   contempt in the next day or two if we didn't have some solid

20   movement on the turnover issue and to please let me know where

21   we stood.

22   Q.    And did you receive any further contact from Mr. Davis

23   after that e-mail of June 29th?

24   A.    I did not.

25   Q.    And just to be clear, you didn't have any contact with

1    regard to delivering the trailer or arrange a time for the

2    delivery of the trailer or to indicate that Mr. Schreibvogel

3    had obtained possession of the trailer and was ready to

4    transport it to our client, Big Cat Rescue?

5    A.    Can you rephrase that?

6    Q.    You didn't have any communications with Mr. Davis -- you

7    didn't receive any communications with Mr. Davis -- from

8    Mr. Davis after the date of that e-mail in Exhibit 4, which is

9    dated June 29th, no response to that e-mail with regard to

10   complying with the order to turn over the trailer?

11   A.    That is correct.

12   Q.    You weren't asked to arrange a time?  You weren't asked

13   to -- you weren't advised that possession of the trailer had

14   been obtained as the order required?

15   A.    That's correct, I was never advised of that.

16   Q.    In fact, you had no further communication at all?

17   A.    That's correct.

18   Q.    With Mr. Davis?

19   A.    With Mr. Davis, yes.

20   Q.    And does that also mean that you had no further

21   communication with his associate who's also cc'd on that

22   e-mail?

23   A.    That is correct.

24            MS. HINTZ:  I don't have any further questions at

25   this time.

1          THE COURT:  All right.  Other witnesses for

2   plaintiff?

3       I'm sorry.  Cross-examination?

4       Here's what I was distracted by:  In our anteroom, I

5   told -- I advised counsel that this may well be a dress

6   rehearsal for what Judge Friot has planned.

7       You should proceed as if you won't be able to call

8   additional witnesses or produce -- or make additional

9   argument.

10      I think what will likely happen in this case is that

11  Judge Friot will have me do a report and recommendation.

12  You'll receive that report and recommendation.  You'll have 14

13  calendar days to object to that report and recommendation.

14      You should assume, I think for -- for your own good,

15  assume that Judge Friot will not give you an opportunity to

16  make additional argument or call additional witnesses.  I

17  think this will be it, as far as the evidentiary part goes.

18      Now, hypothetically, if I certify as to facts

19  constituting contempt and send that to Judge Friot, then there

20  will be the issue of punishment for contempt.  And I'm not

21  quite sure how he's going to handle that, whether he'll have

22  another hearing or whether he will just do that on paper.

23      So proceed as if this is your only opportunity to offer

24  evidence.

25          MS. HINTZ:  Your Honor, may I ask a question?

```
 1              THE COURT:  Certainly.

 2              MS. HINTZ:  In opposing Counsel's opening statement

 3    there were some averments made that are not of evidentiary

 4    value, but, you know, if the witness had appeared, as he was

 5    ordered, potentially there could be have some evidence taken,

 6    but he did not appear.

 7         We did not object to any of those statements at the time

 8    because you had indicated that opening statements had no

 9    evidentiary value.

10              THE COURT:  And I assure you that that will be Judge

11    Friot's conclusion as well.  Someone that is not under oath is

12    just someone talking.

13         While I appreciate opening statements because it gives me

14    a bit of a road map for what I expect to hear in the way of

15    evidence, it's not evidence.  So don't worry about that.

16              MS. HINTZ:  Will we be given the opportunity to make

17    a closing statement at the conclusion of the proceedings?

18              THE COURT:  Certainly, certainly.  Since you've got

19    the burden, it will be closing from plaintiff, closing from

20    the defendants, and then rebuttal from the plaintiff.

21              MS. HINTZ:  Thank you, Your Honor.

22         We would like to reserve the right to recall or to

23    redirect Mr. Kreth.

24              THE COURT:  Certainly.  You'll have a right to call

25    rebuttal witnesses.
```

1          MS. HINTZ:  Thank you.

2      We, if possible, would also like to confer after to

3 determine if we need to call an additional witness just

4 briefly.

5          THE COURT:  Certainly.

6          MS. HINTZ:  Thank you.

7          THE COURT:  Now, Judge Friot may decide to do

8 something completely different, but I want -- for your own

9 safety, I think, assume that this is all you're going to get,

10 as far as the opportunity to present evidence.

11          MS. HINTZ:  Thank you.

12          THE COURT:  All right.  Now cross-examination,

13 Mr. Davis.

14                    **CROSS-EXAMINATION**

15 BY MR. DAVIS:

16 Q.   Mr. Kreth, do you know who Justin Givens is?

17 A.   Yeah.  He's one of the attorneys at our firm.

18 Q.   Okay.  And do you know if you have entered an appearance

19 in what's being referred to as "the Judge Cauthron case"?

20 A.   I honestly don't recall.

21 Q.   Okay.  Were you aware of settlement negotiations and

22 e-mails and discussions in late June and early July?

23 A.   I was aware that there were some discussions.  I did not

24 know the content of them, and I do not recall when those

25 discussions were.

1  Q.   Okay.  Do you know if Justin Givens has entered an

2  appearance in this case?

3  A.   I do not know.

4  Q.   Okay.  Do you know if there were settlement discussions

5  last Thursday morning between Mr. Duffy and Mr. Givens?

6  A.   I do not know.

7  Q.   When is the last time you talked to -- Jason and Justin,

8  I'm getting them mixed up.

9       When is the last time you talked to Mr. Givens about this

10  matter?

11  A.   Maybe two hours ago, over lunch.

12  Q.   Okay.  But in that lunch conversation, he did not discuss

13  his conversations with Mr. Duffy while he was at the airport

14  last Thursday?

15  A.   Not that I have any recollection of.

16  Q.   Okay.  Did anybody ever -- when I say "anybody," I mean

17  anybody.

18       Did anybody ever communicate to you that you guys

19  couldn't go pick up the trailer?

20  A.   No one has communicated with me directly, other than the

21  attorneys at my office, on this case.

22  Q.   Okay.

23            MR. DAVIS:  No further questions, Your Honor.

24            THE COURT:  All right.  Redirect?

25            MS. HINTZ:  We don't have any further questions at

1    this time.

2              THE COURT:  All right.  You may step down.

3                        (Witness excused).

4              THE COURT:  And plaintiff may call its next witness.

5              MS. HINTZ:  Your Honor, except for redirect or after

6    the defendant has put on any witnesses they may might have, we

7    reserve the right to --

8              THE COURT:  Certainly.  Rebuttal?

9              MS. HINTZ:  -- have rebuttal witnesses.

10             THE COURT:  Certainly.

11             MS. HINTZ:  Thank you.

12             THE COURT:  All right.  For the defendant?

13             MR. DAVIS:  Your Honor, I call Ryan Duffy.

14             THE COURT:  Is there anyone that has testified so

15   far that is not a lawyer?

16             MR. DAVIS:  No, Your Honor.

17             THE COURT:  All right.  I just want to point out how

18   bizarre that is, to only have lawyers testifying.

19        Go ahead.

20                        (Witness duly sworn)

21                        **RYAN DUFFY,**

22   after having been first duly sworn, testifies as follows:

23                     **DIRECT EXAMINATION**

24   BY MR. DAVIS:

25   Q.   Mr. Duffy, would you state your name and occupation for

1   the record?

2   A.   Ryan Duffy.  I'm an attorney with the Andrews Davis law

3   firm.

4   Q.   And are you familiar with the facts in this case and also

5   in the facts in the -- what we're referring to as "the Judge

6   Cauthron case"?

7   A.   Painstakingly so.

8   Q.   Okay.  Do you respect anyone in this case, any defendant?

9   A.   I do not represent any of the plaintiffs or defendants in

10  this matter.

11  Q.   Okay.  Who do you represent in the Judge Cauthron case?

12  A.   I represent the Gerold Wayne Interactive Zoological

13  Foundation in the Judge Cauthron case.

14  Q.   Mr. Duffy, how long have you been involved in either this

15  matter -- well, you're not involved in this matter.

16      How long have you been involved in the Judge Cauthron

17  matter?

18  A.   Actually, I should correct for the record.  I believe we

19  had an entry in the old case -- this case through my old law

20  firm, Stuart & Clover, but that has since been withdrawn.

21      My overall global activity in this case began in November

22  of 2014.

23  Q.   Do you know the defendant in this case, Joe Schreibvogel?

24  A.   Yes, sir.

25  Q.   Do you know the last time you talked with him?

1   A.   He inquired yesterday on behalf of the park -- he is a

2   contractor for the park -- as to what the status of the

3   settlement negotiations were.

4        And I spoke with him today to confirm that he was,

5   indeed, in Iowa and would be unable to attend today.

6             MR. DAVIS:  Your Honor, may I approach?

7             THE COURT:  You may.

8   Q.   (BY MR. DAVIS)  Mr. Duffy, is it fair to state that you

9   and I have had numerous conversations about this matter?

10  A.   Yes.

11  Q.   Okay.  I have handed you what's been marked Defendant's

12  Exhibit 1.

13       Can you identify that for the record?

14  A.   That is an e-mail from myself dated July 10th, 2015, to

15  Justin R. Givens with also Mel McVay and Heather Hintz in the

16  "to" line and copying my fellow associate at Andrews Davis,

17  Peter Scimeca, and yourself, Mr. John Davis.

18  Q.   Does Mr. Scimeca -- he's your co-counsel in the Cauthron

19  case?

20  A.   Yes.

21  Q.   Does he represent anyone in this case?

22  A.   No.

23  Q.   Okay.  What is the general flavor -- what was the purpose

24  of this e-mail?

25  A.   Sure.

1    You and I had discussed the issue with the trailer, and I

2    indicated that I think that this problem is that they're

3    wanting the zoo to make sure that they disclaim any interest.

4    So I contacted Justin -- Mr. Givens via telephone to

5    confirm that we don't have any interest in the trailer and

6    that I would put him in contact with you via an e-mail to

7    confirm that fact, and that they should take it forward from

8    there with respect to the trailer in relation to the

9    settlement negotiations as well.

10   Q.   Could you -- I believe Ms. Hintz testified that the

11   settlement negotiations were confidential.

12   Is it -- were there ongoing settlement negotiations at

13   this time to globally settle both lawsuits?

14   A.   Certainly.

15   Q.   Do you know when those settlement negotiations started,

16   approximately?

17   A.   My recollection would be that they have been ongoing for

18   sometime but were really began in earnest in -- late June

19   would be about the same that they heated up.

20   Q.   Okay.  You're familiar with Plaintiff's Exhibits -- it's

21   document number 99.  I don't know what Plaintiff's Exhibit it

22   is, but it's the order to turn over possession of the trailer.

23   Are you familiar with that?

24   A.   Yes.

25   Q.   Okay.  How long have you been familiar with that?  It was

1  actually filed with the Court on June the 9th.  How long have

2  you been familiar?

3  A.    It would have come into my inbox electronically.  I

4  always open those as soon as I get them.  So provided I was in

5  the office that day, I would have seen it on June 9th.

6  Q.    Okay.  Did you receive it --

7           MR. DAVIS:  Your Honor, may I approach?

8           THE COURT:  Sure.

9  Q.  (BY MR. DAVIS)  Document number 100, the certificate of

10  service, which I believe is your --

11           THE COURT:  It's the second page of the --

12           MR. DAVIS:  It's the last page of the motion.

13           THE COURT:  Of the motion, okay.

14           MR. DAVIS:  Document number 100.

15           THE COURT:  Document number 100, page 5.

16  Q.  (BY MR. DAVIS)  When you said you received it in your

17  inbox, is it because you were on the certificate of mailing?

18  A.    Yes.

19  Q.    Okay.  But you're not counsel --

20  A.    Well, we are not a party to this matter, as in a

21  first-term party.  Forgive me for my failure to get the proper

22  term here.

23       We are a garnishee of Mr. Schreibvogel, as someone making

24  payments to him.  I believe there is a garnishment order in

25  this matter for us to pay any funds that we do to

1   Mr. Schreibvogel from my client, being the Gerold Wayne

2   Interactive Zoological Foundation, over to the plaintiff.

3            THE COURT:  I am handing your witness a copy of the

4   document that I printed about an hour ago.  You'll see just

5   what capacity you're in the case, at least according to the

6   docket.

7            MR. DAVIS:  Thank you, Your Honor.

8            WITNESS:  Yes.  It shows that I am, in fact, as I'd

9   stated, counsel for the garnishee.  So not an actual defendant

10  or plaintiff in this matter, but rather the garnishee, which I

11  believe would be classified as a third party.

12  Q.   (BY MR. DAVIS)  So as counsel for garnishee of the

13  defendant here, Mr. Schreibvogel, you received this on July

14  the 10th?  That's the date on the certificate of service.

15  A.   Yes.

16  Q.   On the same day, Defendant's Exhibit 1, your e-mail, went

17  out, do you know which one of these you received first -- or

18  which one of these happened first?

19  A.   I received the docket for that document subsequent to my

20  transmittal of this e-mail.

21  Q.   Okay.  But at the time you sent the e-mail, is it your

22  testimony that there was ongoing settlement negotiations to

23  globally settle everything?

24  A.   Yes.

25  Q.   Including the possession of this trailer?

1    A.    Yes.

2    Q.    Okay.  Do you believe that the recipients of your e-mail

3    -- Mr. Givens, Mr. McVay, and Ms. Hintz -- knew that this

4    trailer was part of that global settlement?

5    A.    It had --

6            MR. McVAY:  Objection, Your Honor.  Calls for

7    speculation.

8            THE COURT:  If you know.

9            WITNESS:  I don't know their specific -- being

10   Ms. Hintz's and Mr. McVay's specific mind set, but we had had

11   discussions with Justin about, do we want to include minutiae

12   in this settlement agreement or should we make a wide global

13   offer that would settlement all claims?

14        It was determined that we would make a wide global offer

15   rather than getting down to bits and pieces.

16   Q.  (BY MR. DAVIS)  Okay.  So is it your testimony, your

17   understanding, your belief, that at the same time you're

18   sending an e-mail about a global settlement this came in to

19   you as attorney for garnishee?

20   A.    Yes.

21   Q.    Regarding the subject matter of this motion for contempt?

22   A.    Yes.

23   Q.    Do you have any knowledge of any conversation that you

24   would have had, either with your client or the garnish- -- Joe

25   Schreibvogel, as to whether or not anybody was claiming an

1  interest in that trailer and whether or not they would just

2  say "come and get it"?

3  A.   The only conversations that -- I recall having a

4  conversation with Mr. Givens at the zoo the day that we were

5  having the computers copied where I said essentially, what do

6  we need to do about this trailer?

7       He said, "I think that they're just trying to determine

8  that the zoo doesn't have an interest, but I'll check with

9  Heather."

10      I said, "Well, we don't have an interest.  Joe says that

11 you can come get it.  Proceed and we'll take that up whenever

12 you're ready."

13 Q.   Okay.  Was that before or after this e-mail, the time

14 when you met with Attorney Givens at the zoo down by Davis or

15 Sulphur?

16 A.   By Wynnewood.  But it would have been before this e-mail.

17 Q.   I'm sorry.  What?

18 A.   It would have been before this e-mail.

19 Q.   Prior to July 10th, prior to your e-mail and prior to

20 this motion to hold the defendant in contempt, you conveyed --

21 this is the question.

22      Did you convey to one of the attorneys at -- let me get

23 my law firm correct -- Phillips Murrah that they could come

24 and get the trailer?

25 A.   My communication was to Mr. Givens, and I stated from

1   what I had been conveyed from Mr. Schreibvogel, the trailer is

2   in Texas, it doesn't have a tag on it, and we don't think -- I

3   don't think -- excuse me.  Let me slow down.

4        It's my understanding that he is going to be unable to

5   deliver it, but the zoo does not have an interest, and it

6   would be able to be arranged for the plaintiff to pick up the

7   trailer.

8   Q.   For the plaintiff to pick it up?

9   A.   Yes.

10  Q.   Okay.  Last -- when was your last communication with

11  anyone at the Phillips Murrah firm about global settlement of

12  this matter?

13  A.   I spoke with Mr. Givens last Thursday when I was at the

14  airport.

15  Q.   How long was that conversation?

16  A.   I would guess it was probably 15 minutes or so.

17  Q.   Okay.  So it was -- I understand the settlement may be

18  confidential, but my question is, in that conversation did he

19  communicate to you that you would be receiving a settlement

20  proposal offer?

21            MR. McVAY:  Objection.  Hearsay.

22            THE COURT:  Who's the speaker?

23  Q.   (BY MR. DAVIS)  Did you anticipate receiving a settlement

24  offer?

25            THE COURT:  There you go.

1          WITNESS:  Whenever I spoke with Mr. Givens, I

2    inquired as to were we to be expecting a settlement

3    counteroffer.  And the anticipation from that side that I

4    gathered was, yes, there would be a counteroffer forthcoming.

5    Q.   (BY MR. DAVIS)  Have you received that counteroffer yet?

6    A.   Not to date.

7    Q.   Not since you left your office at 1:30?

8    A.   Correct.

9    Q.   I mean, not prior to that?

10   A.   Yes.

11   Q.   Okay.  Did you have any discussion last Thursday about

12   the trailer?

13   A.   We did not.  Last Thursday's discussion centered around

14   settlement and who could accept service for certain

15   individuals that would be related to my client.

16   Q.   Okay.  Is it your understanding that it was a global

17   settlement discussion?

18   A.   Yes.  That's been our anticipation at least the whole

19   time.

20   Q.   So was the trailer in any way excluded in your mind or

21   was it part of that global settlement as late as last

22   Thursday?

23   A.   It certainly was not excluded.

24   Q.   Have you ever seen the trailer?

25   A.   I have not, other than in pictures from the hearing on

1    assets.

2              MR. DAVIS:  Okay.  No further questions, Your Honor.

3              THE COURT:  All right.  Cross-examination by

4    Mr. McVay.

5              MR. McVAY:  Thank you, Your Honor.

6                        **CROSS-EXAMINATION**

7    BY MR. McVAY:

8    Q.   You are a lawyer, Mr. Duffy; correct?

9    A.   Yes.

10   Q.   Would you agree with me that in exercising due diligence,

11   that Mr. Schreibvogel or his counsel should have filed a

12   response to the motion for contempt that was filed by the

13   plaintiff in this case explaining --

14             MR. DAVIS:  Objection, Your Honor.

15   Q.  (BY MR. McVAY)  -- why Mr. Schreibvogel had not delivered

16   the trailer?

17             THE COURT:  Response to the objection.

18             MR. McVAY:  It's a relevant question.

19             THE COURT:  Well, I think you're --

20             MR. McVAY:  He's a lawyer.

21             THE COURT:  Well, I think you're asking him about

22   his legal practice and what the standard of care is for

23   lawyers.  This isn't a malpractice case yet.

24        So how is that an appropriate question?

25             MR. McVAY:  Well, I think, as the Court had noted,

```
 1    that the amount of diligence that went into responding to the
 2    Court's order is relevant.
 3             THE COURT:  If you'll keep it close to the diligence
 4    issue, I'll allow it.
 5        So objection overruled.
 6             WITNESS:  Could you restate the question for me,
 7    please?
 8             MR. McVAY:  Let me restate it.
 9    Q.  (BY MR. McVAY)  In the exercise of diligence, do you
10    believe that the plaintiff's motion for contempt should have
11    been responded to by Mr. Schreibvogel?
12    A.   That would be between he and his attorney to make a
13    determination of.
14    Q.   I'm asking you as an attorney.
15    A.   I was not privy to their conversations.
16    Q.   But as an attorney, do you believe that it would have
17    been diligent, once a motion is filed with the Court -- and
18    you understand there is a time frame for responding to that
19    motion -- that in being diligent, that Mr. Schreibvogel should
20    have responded to that motion in a timely fashion?
21    A.   There's any number of facts and circumstances that could
22    play into that determination.
23    Q.   I'm not asking -- I'm not asking as to --
24             THE COURT:  Let's move on.  I think you've made your
25    point.
```

1          MR. McVAY:  All right.

2     Q.  (BY MR. McVAY)  Do you know of any reason why settlement

3     negotiations would have relieved Mr. Schreibvogel of his

4     obligation to turn over the trailer or to appear in this

5     courtroom today?

6     A.  I don't.

7     Q.  You may have to refresh my recollection on when the

8     settlement offer was made that Mr. Davis was talking about,

9     the global settlement offer.

10          It was sometime in mid-June; is that correct?

11    A.  I believe it may have been closer to late July, but I

12    would need to look at the document myself.

13    Q.  And Ms. Hintz testified that it was a fairly short time

14    frame, a few days or maybe it was a week.  But do you know

15    when that offer terminated?

16    A.  Fifteen days is sticking in my head.  I could be

17    incorrect about that, but 15 days is sticking in my head.

18    Q.  But that offer terminated before today?

19    A.  Yes.

20    Q.  That offer is not pending?

21    A.  Yes.

22         We had visited with Justin previously, and we thought

23    that we were going to be -- we indicated that maybe it would

24    still be on the table, that we'd hoped to get a counter.

25    Q.  Okay.  So there's no settlement negotiations pending

1  right now, or settlement offers pending right now?

2  A.   There's no formal written settlement offer pending at

3  this time, that's correct.

4  Q.   You may have already testified to this as well, but

5  during the course of these negotiations or the settlement

6  offer itself, there's been no communication specifically about

7  this Dane trailer; is that correct?

8  A.   I would reiterate my previous testimony, that there was a

9  determination made that we wouldn't address minutiae, that

10 those could be outlined at a later time.

11     But, no, the trailer hasn't been specifically written

12 down or considered as an intricate portion of the settlement.

13         THE COURT:  I've got a question.

14     Has it been mentioned at all?  Is it on a list of assets

15 to be transferred, individually named?

16         WITNESS:  Well, I would say that it's been

17 mentioned, via this e-mail, that it's Joe's trailer, he's a

18 defendant in this matter, and that we were going to try to

19 settle the matter on behalf of all defendants in an effort to

20 get this thing done with.

21         THE COURT:  Okay.

22         MR. McVAY:  That's all I have, Your Honor.

23         THE COURT:  All right.  Redirect?

24

25

1          <u>**REDIRECT EXAMINATION**</u>

2  BY MR. DAVIS:

3  Q.   Mr. Duffy, as an officer of the court, is it your good

4  faith belief that Mr. Givens knew, in all of your discussions,

5  that Joe Schreibvogel was going to be released of any and all

6  liability in this case, including this trailer issue, as part

7  of your settlement negotiations?

8          MR. McVAY:  Objection.  Calls for speculation, Your

9  Honor.

10          THE COURT:  Overruled.  I'll allow it.

11     Go ahead.

12          WITNESS:  Absolutely.

13  Q.  (BY MR. DAVIS)  Were there -- I just want to be clear.

14     Was there a list of assets ever attached to a settlement

15  agreement but this trailer was excluded from that list of

16  assets?

17  A.   There was no list of assets, period.

18  Q.   No list of assets of any defendant in either case?

19  A.   No.

20          MR. DAVIS:  Okay.

21     Thank you, Your Honor.

22          THE COURT:  Recross?

23          MR. McVAY:  No, Your Honor.

24          THE COURT:  All right.  You may step down.

25               (Witness excused).

1          THE COURT:  Any other witnesses for the Defendant

2    Joe Exotic?

3          MR. DAVIS:  No, Your Honor.

4          THE COURT:  Rebuttal witnesses from plaintiff?

5          MS. HINTZ:  No, Your Honor.

6          THE COURT:  All right.  Closing then from plaintiff.

7          MR. DUFFY:  Your Honor, if I may, being an officer

8    of the court, I have another obligation at four o'clock.  I

9    don't think I'm integral to the closings unless anyone has an

10   objection.

11         THE COURT:  I think everybody -- is everyone

12   finished with Mr. Duffy?

13         MR. McVAY:  Yes, Your Honor.

14         MS. HINTZ:  Yes.

15         THE COURT:  All right.  Remember this experience

16   testifying and be kind to your clients.

17      (Mr. Duffy exits courtroom.)

18         THE COURT:  All right.  Then we're at closing from

19   plaintiff.

20         MS. HINTZ:  Thank you, Your Honor.

21      The case law provides that to establish a civil contempt

22   the movant needs to establish that a valid order exists, the

23   defendant had knowledge of the order, and that the defendant

24   disobeyed -- was not reasonably energetic and diligent in

25   complying with the order.

1          Here, we have a stipulation that a valid court order

2    exists and that both defendant's counsel and defendant had

3    knowledge of the order.

4          The order in question is the order granting plaintiff's

5    motion for turnover of property.

6          This is a collection case in which Big Cat Rescue Corp,

7    the plaintiff, is trying to collect on a $953,000 judgment

8    against the defendant, Mr. Schreibvogel.  The order granting

9    plaintiff's motion for turnover was issued pursuant to those

10   efforts.

11         The order was issued on the 9th of June, and it required

12   three things of Defendant Mr. Schreibvogel.

13         It required that, first of all, he obtain possession of

14   the Great Dane trailer and deliver it to Big Cat Rescue within

15   10 days of the date of this order.

16         It's not disputed that that did not occur.  It would have

17   had to occur by June 19th.  It did not occur.

18         It was also ordered that Mr. Schreibvogel or his counsel

19   should contact counsel for Big Cat Rescue within 5 days of the

20   date of the order, which would be by June 14th, 2015, to

21   arrange a time and location suitable to BCR and within the

22   jurisdictional limits of the court for delivery of the trailer

23   to BCR in accordance with the order.

24         It is not disputed that that did not occur.  In fact,

25   it's undisputed that there was no contact by defendant or his

counsel to plaintiff's counsel until sometime after June 19th, 2015.

So not only was there -- there was no effort at all.  It could not be -- the effort that was conducted could not be characterized as reasonably energetic, diligent, or anything else because there was absolutely no effort.

The only contact that occurred was initiated by plaintiff's counsel after the obligations of the time for defendant to comply with the order had passed.

When plaintiff's counsel reached out to defendant's counsel to try to get some movement, have some discussions about obtaining the trailer, there was no response.

Mr. Kreth and I both testified that although we received absolutely no response, no contact from plaintiff -- from defendant by June 19th, after June 19th we reached out to defendant's counsel trying to initiate discussions.

We were asked to call back on June 29th and did recontact defendant's counsel, and there was absolutely no further contact made.

There was -- in essence, the only contact between Mr. Schreibvogel's counsel and plaintiff's counsel, pursuant to this order, was the request on June 24th that we recontact him on June 29th.

The e-mail that the Gerold Wayne Interactive Zoological Foundation's lawyer sent on June 10th was not in compliance

1   with the order.  First of all, they don't represent the

2   defendant and -- Mr. Schreibvogel.  They represent the Gerold

3   Wayne Interactive Zoological Foundation.

4       That e-mail did not -- it simply disclaimed the interest

5   of the zoo in the trailer and then cc'd Mr. Davis that he

6   should follow up with plaintiff's counsel.  No follow-up was

7   ever undertaken by defendant's counsel.

8       There has been some statements made today regarding that

9   the trailer couldn't be moved or isn't tagged.  There's

10  absolutely no evidence in that regard.  The only person with

11  that knowledge of that presumably would be Mr. Schreibvogel,

12  who owns the trailer.  He was ordered to appear today but

13  didn't appear.

14      So there's no -- in any event, that -- discussions of

15  those kinds were not had during the time frames contemplated

16  by the order.  There was no objection to the motion for

17  turnover, that there would be some impossibility.

18      There was no objection or motion to quash filed with

19  respect to either the motion for contempt or the order setting

20  this hearing, the show cause hearing.  So absolutely nothing

21  on the record.

22      The record is completely devoid of any defense, response,

23  objection of any nature regarding either the turnover or the

24  show cause hearing, why the defendant should not be held in

25  contempt.

1       And that is, unfortunately, consistent with the testimony

2  that there was similar silence with regard to the double

3  requirements put on the defendant in the order of contacting

4  plaintiff's counsel to arrange delivery and obtaining

5  possession and delivering.  There was absolutely no

6  communication within the time frame set out in the order of

7  the court.

8       Consequently, we believe the Court has been presented

9  with sufficient evidence of civil contempt; clear and

10  convincing evidence, in fact.  There's absolutely no evidence

11  that there was compliance with the Court's order.

12       And we would request that the matter be certified to

13  Judge Friot as there being sufficient cause to find the

14  defendant in contempt of the Court's order for turnover of the

15  property.  And we would request an award of our fees and costs

16  in pursuing this contempt motion, and that there be a finding

17  of contempt, and that the Court would order the defendant to

18  deliver the trailer to the plaintiff within 10 days of the

19  finding -- of today's date or the finding of contempt at a

20  place convenient and acceptable to plaintiff.

21       And if the defendant should fail to comply, that he be

22  assessed a fine that would go to the benefit of plaintiff in

23  the average value of this sort of trailer, which we believe

24  would be $10,000, and would be imprisoned for 30 days under

25  the Court's contempt power, which he could purge by complying

1   with the terms of the Court's turnover order.

2       I don't have anything further.

3           THE COURT:  All right.  Closing from the defendant,

4   Mr. Davis.

5           MR. DAVIS:  Your Honor, we will absolutely stipulate

6   that the order is there and was properly delivered.

7       We vehemently refute that the defendant, whether through

8   Mr. Duffy, whether through myself or through any other

9   mechanism, did not adequately reasonably diligently

10  communicate that they can go get the trailer anytime they

11  want.

12      They've got a $953,000 judgment.  There's a separate

13  lawsuit involving similar assets and similar things.

14      The defendant here is currently an employee of the

15  defendant in the other -- in the Judge Cauthron case.  He has,

16  as early as the hearing on assets that was conducted on March

17  6th, gave them a picture of the trailer, told them where the

18  trailer was, and told them they could go get it.

19      We would disagree about the value.  It's not worth

20  10,000, but let's assume it's worth 5-.

21          THE COURT:  Let me clarify something or help clarify

22  something for you, Mr. Davis.

23      We've got -- the Great Dane trailer was identified by

24  Mr. Schreibvogel in his -- under oath, I suppose, hearing on

25  assets as being his personal asset that was owned free and

1  clear of any liens or encumbrances?

2          MR. DAVIS:  If I remember the testimony, he did

3  identify it as something that belonged to him that was titled

4  to his name.

5          THE COURT:  Okay.

6          MR. DAVIS:  It was always used by the other

7  defendant in this lawsuit, okay, but it was titled in his

8  name.

9          THE COURT:  Okay.  Thank you.

10          MR. DAVIS:  We don't dispute the judgment and we

11  don't dispute how it was titled, okay.

12      As early as March 6th they were informed they could go

13  get the trailer and it didn't have a tag on it.

14      As late as last Thursday, July 29th, in the companion

15  case, you've got testimony that they're still talking

16  settlement negotiations, which would include this trailer.

17      My client has in no way thumbed his nose to this Court or

18  to the plaintiffs, but in all situations said "go get the

19  trailer."

20      He does not have the money to tag it.  He does not have

21  the money to transport it.  They can have it, where is, as is,

22  where it is, in Kaufman, Texas.

23      They know where the trailer is.  It's never tried to be

24  hidden.  It's been part of a global settlement agreement.

25      In my opinion, this whole thing is just to harass, to get

1    an advantage in the Judge Cauthron lawsuit.  I don't see any

2    reason for contempt here.  They know where the trailer is, and

3    they can go get it.

4         Now, if he needs to sign a title or a certificate for a

5    lost title, he will do that.  I'll stipulate that he'll do it,

6    but this is not an issue where someone should be punished or

7    go to jail because they're not turning something over or

8    they're in violation of a court order.

9         This law firm has no less than four lawyers involved in

10   the two matters.  I don't know what communication they do

11   internally, but as of last Thursday they're still talking

12   settlement in the other lawsuit, which involves this trailer

13   and this defendant.

14        Your Honor, I would just ask for equity to be done and

15   this gentleman be left to just go do his own business, and

16   they go get the trailer.

17             THE COURT:  One more question.

18        Is -- if you know, is the trailer moveable?  Does it

19   still have wheels that roll?

20             MR. DAVIS:  Based upon the picture dated in March of

21   2011, four years before the hearing on assets, it was very

22   moveable.

23        I don't know if the tires are flat.  I don't know the

24   condition of it.  The only person who would really know the

25   condition of the trailer -- I don't remember his name, but he

1  is the gentleman in Iowa with my client.

2          THE COURT:  The tiger guy, Taranova?

3          MR. DAVIS:  Yes, yes.  He would know the condition

4  of the trailer.  It is at his location.

5          THE COURT:  Okay.  Thank you.

6          MR. DAVIS:  I will say this:  We will fully

7  cooperate with them going and getting the trailer anytime they

8  want to go get it, and the title.  But we don't have the money

9  to pay for anything to transport it.

10          THE COURT:  All right.

11          MR. DAVIS:  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13      And rebuttal from the plaintiff?

14          MS. HINTZ:  Your Honor, the plaintiff would like to

15  print out the -- there is no evidence in the record that the

16  plaintiff was told to go pick the trailer up.

17      The -- I have the transcript of the hearing on assets.

18  The Court -- Mr. Davis characterized some testimony a moment

19  ago that that offer was made to pick the trailer up at the

20  hearing on assets.

21      That's not in the record.  In fact, it didn't occur.

22  There's never been an offer made to pick the trailer up.

23      In any event, the order that we're addressing here today,

24  which is the order for turnover, directs the defendant to

25  contact the plaintiff and make arrangements to deliver it and

1  -- to obtain possession and, in fact, deliver it by June 19th.

2      The discussions and offers that Mr. Davis is

3  characterizing in his closing statement, the evidence shows

4  those didn't occur.

5      The Court's order was issued on June 9th.  None of the

6  "come get the trailer, it's yours, we have no objection," none

7  of those -- there was absolutely no communication during the

8  term required by the Court's order.

9      Today, here before the Court, that characterization is

10  being made, but the evidence before the Court today from the

11  testimony is that there was absolutely no communication

12  regarding picking up the trailer, delivering the trailer,

13  making arrangements.

14      Plaintiff's counsel tried to initiate those kind of

15  discussions with the defendant's counsel, but they did not

16  occur.

17      So to belatedly, on the date that the only person who

18  knows the condition of the trailer should have been here and

19  wasn't here, the condition of the trailer isn't properly in

20  the record because Mr. Schreibvogel didn't appear.

21      And the plaintiff would just point out again that none of

22  the characterizations of trying to deliver the trailer to the

23  plaintiff that defendant's counsel is making right now

24  occurred, ever, during the pendency of the obligations that

25  were imposed by the Court's order.

1    So in the equity in the situation, to the extent equities

2  are to be considered, is that the defendant had -- the

3  plaintiff had to go to the trouble of filing the motion and

4  obtaining the order.

5    And when the order wasn't complied with for the $5- to

6  $15,000 trailer to be applied to its $973,000 judgment, then

7  filed the motion for contempt, and nothing was ever filed of

8  record, and no communications were ever had with us.

9    So the equities are on the side of the plaintiff in this

10  case to the extent that that has to be considered.  Thank you.

11    THE COURT:  All right.  Counsel, I've got a lot to

12  say, but I'm going to say it in writing.  I believe that's the

13  way -- that's Judge Friot's preference is that I prepare a

14  report and recommendation.

15    It will depend on when I can get the record.  Not to put

16  any -- my understanding is you can request an expedited

17  record.  If you request an expedited record, then --

18  Ms. Grubbs, when will we get the record?

19    (Discussion held off the record.)

20    THE COURT:  Here is the problem with requesting an

21  expedited record.  You'll have to pay for it.  I don't know

22  whether you want to do that or not.

23    If you don't request an expedited record, then I should

24  have the record in my hands in 14 days.  So you'd probably

25  have my R&R within 30 days of today.  So it's going to be a

1   while.

2        Now, if you want to request -- to save yourself a couple

3   of weeks, request an expedited record and pay for it, then you

4   can cut it by two weeks.  Once I have the record in my hand, I

5   just need about 10 days to finalize an R&R.

6        MS. HINTZ:  Your Honor, we would like to request an

7   expedited record of the court reporter.

8        THE COURT:  Okay.  So once I get that record, give

9   me about 10 days to finish it.

10       Once you get -- in your e-mail box, once you get a copy

11  of my report and recommendation, you've got 14 days -- this

12  will be in the R&R.  You've got 14 days to file your objection

13  to the R&R.  So that's what will happen over the next few

14  weeks.

15       Any questions about the process?

16       MS. HINTZ:  Not on our side.

17       THE COURT:  I really enjoyed seeing so many lawyers

18  testify.

19       MS. HINTZ:  I wish we could say the feeling was the

20  same on our side.

21       THE COURT:  Now you know how uncomfortable your

22  clients feel.

23       All right.  Nothing further from plaintiff?

24       MR. McVAY:  No, Your Honor.

25       THE COURT:  Mr. Davis, from the defendant?

1          MR. DAVIS:  No, Your Honor.

2          THE COURT:  All right.  You're excused and we're

3     adjourned.

4        (Proceedings adjourned at 3:57 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2

3          I, SHERRI GRUBBS, Federal Official Court Reporter in

4    and for the United States District Court for the Western

5    District of Oklahoma, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code that the foregoing

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter and

9    that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12          Dated this 8th day of August, 2015.

13

14          /S/ SHERRI GRUBBS_____

15          SHERRI GRUBBS, RPR, RMR, RDR, CRR
            State of Oklahoma CSR No. 1232.
16          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25